UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )
                               )   5:19-CR-479-1D
         vs.                    )
                               )
EMILIO R. MORAN,                )
            Defendant.          )
_____)
```

AUGUST 4, 2021
SENTENCING HEARING
BEFORE THE HONORABLE JAMES C. DEVER III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

JOHN PARRIS, ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601

On Behalf of the Defendant:

ELISE CYRE SALMON, Esq.
The Salmon Law Firm, LLP
P.O. Box 185
Lillington, North Carolina 27546

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

 1          (Wednesday, August 4, 2021, commencing at 2:10 p.m.)

 2                    P R O C E E D I N G S

 3          THE COURT:  We'll next take up the sentencing of

 4     Emilio Moran.

 5          (Pause in the proceeding.)

 6          MS. SALMON:  Your Honor, if Mr. Parris tried to

 7     contact me, my phone is in my car in the parking lot, so I do

 8     not know.  He may have, and I just don't know.  But it's been

 9     in the car since about 1:30.

10          THE COURT:  Thank you.

11          (Pause in the proceeding.)

12          MS. SALMON:  Your Honor, this is my client's family.

13          (Pause in the proceeding.)

14          MR. PARRIS:  I feel I need to apologize to the

15     Court, Your Honor.  It was my understanding it was at 2:30 in

16     my last notice.  I apologize if that was not correct.

17          THE COURT:  I was just looking at the CM/ECF notice

18     that went to your office on July 9th, 2021, that set this

19     hearing for 2:00 o'clock.

20          MR. PARRIS:  I profusely apologize.  That is my

21     fault.  I had entered it in my system at 2:30, and that was

22     obviously my error.  And I greatly apologize, Your Honor, for

23     that.  And that is all my responsibility, not co-counsel or

24     the Government agent present.

25          THE COURT:  Do better.

1          MR. PARRIS:  Yes, Your Honor.

2          THE COURT:  Because there are a lot of people that

3   get together and not just about my time.  The court reporter

4   is here.  Deputy clerk is here.  The marshals are here.  Your

5   opposing counsel is here.  The defendant is here.  Victims can

6   be here.  Family can be here.

7          All right.

8          At this time we'll take up the sentencing of Emilio

9   Moran.

10         Ms. Salmon, are you and the defendant ready to

11  proceed?

12         MS. SALMON:  Yes, Your Honor, we're ready.

13         THE COURT:  Is the Government ready?

14         MR. PARRIS:  Yes, Your Honor.

15         THE COURT:  At this time I'd ask that the defendant

16  be sworn or affirmed.

17     (The defendant, Emilio Moran, was duly sworn.)

18         THE COURT:  Mr. Moran, do you understand that having

19  been sworn, that your answers to my questions are subject to

20  the penalty of perjury; and if you were to lie to me, you

21  could be prosecuted for perjury or for making a false

22  statement?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Have you taken any kind of medicine or

25  any other substance in the last 48 hours that would affect

1   your ability to hear and understand this proceeding?

2           THE DEFENDANT:  No, sir.

3           THE COURT:  Do you know why you're here today?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Ms. Salmon, do you have any reason to

6   doubt Mr. Moran's competence to go forward today?

7           MS. SALMON:  No, Your Honor.

8           THE COURT:  Does the Government have any reason to

9   doubt Mr. Moran's competence to go forward today?

10          MR. PARRIS:  No, Your Honor.

11          THE COURT:  Based on Mr. Moran's answers to my

12  questions, my observations of him and the answers from

13  counsel, I find that he is competent.

14          Mr. Moran, you're here today having entered a plea

15  of guilty to two charges.  Count 2 is sexual abuse of a minor.

16  Count 3 is enticement of a minor.  You entered a plea of

17  guilty to those two charges pursuant to a plea agreement.  I

18  hereby accept the plea agreement.

19          The sentencing guidelines are no longer mandatory;

20  they're advisory.  Nevertheless, I'm to take into account the

21  now-advisory guidelines.

22          I do this by initially making findings of fact and

23  calculating an advisory guideline range.  I'll then consider

24  any motion that might be made that might move that range

25  either up or down.  I'll then consider all arguments that your

lawyer makes, any statement you'd like to make, any victim
allocution and the arguments of the Assistant United States
Attorney.  I'll then determine your sentence, and I'll
announce it here in court today.  That'll be the process we'll
follow.

Ms. Salmon, did you receive a copy of the
presentence report?

MS. SALMON:  Yes, Your Honor.

THE COURT:  Mr. Moran, did you speak with your
lawyer, Ms. Salmon, about the presentence report?

THE DEFENDANT:  Yes, sir.

THE COURT:  At this time the Court directs that the
presentence report be placed in the record under seal.

In accordance with Rule 32 of the Federal Rules of
Criminal Procedure, the Court accepts as accurate the
presentence report, except as to matters in dispute as set
forth in the addendum.

I have reviewed the entire report, including the
addendum.  The addendum does contain a number of objections.

Ms. Salmon, does Mr. Moran want to be heard on
those?

MS. SALMON:  Your Honor, the defense does persist in
those objections, and I'd only like to address the cross
reference for purposes of the record.

THE COURT:  Okay.

1          MS. SALMON:  Your Honor, those objections are fully

2    set forth incorrectly in the addendum and in the filed PSR

3    objections.

4          Your Honor, the defense is familiar with Fourth

5    Circuit case law in this area, including *United States versus*

6    *Cox*, the Fourth Circuit case which applies the broad language

7    that's contained in 2G2.1 and the commentary notes.  It says

8    that it should apply broadly.

9          However, Your Honor, we submit that *Cox* should not

10   be read to apply the cross references in all enticement cases

11   and in all instances.  And we submit, Your Honor, that in this

12   case, it should not.  To the extent that *Cox* can be read in

13   that manner, we would submit that *Cox* was wrongly decided.

14         Your Honor, the conduct in this case is outside the

15   heartland of the 2G2.1 cross reference.  The objection to this

16   as a legal matter is twofold.

17         Your Honor, the defense admits that the language is

18   sufficiently broad as set forth in the guidelines; that it

19   could be read to encompass any enticement case.  There is a

20   myriad of case law related to sentencing issues in this

21   circuit which say if an enhancement applies to the elements in

22   every case of offense, then it's no longer an enhancement.

23   It's just the Sentencing Guidelines Commission grafting

24   additional punishment on for every statutory sentence.

25         In my practice most often came up, Your Honor, in

1   the risk of substantial injury and human health and

2   environment in the home cooked meth cases where there was

3   quite a while when that was applying to every home cooked meth

4   case until the Fourth Circuit came back and made a correction

5   and said:  No, it has to be something outside the heartland of

6   those cases in order for the enhancement to be appropriately

7   applied.

8           Your Honor, to the extent that *Cox* can be read to

9   apply the cross reference to all cases where the defendant has

10  pled to enticement, we would submit that that does violate the

11  principles in sentencing that enhancements should not be

12  applied in that fashion.

13          But, Your Honor, ultimately, with *United States v.*

14  *Cox* being controlling precedent, the defense simply submits

15  that this case -- the facts of this case are not within the

16  heartland of the cross reference and its appropriate

17  application and should not be applied in this case.

18          THE COURT:  Thank you.

19          Mr. Parris.

20          MR. PARRIS:  Your Honor, the probation officer's

21  response is spot on in this case in applying this cross

22  reference.  And we offer that the guidelines do take in effect

23  and would apply to the facts of this case.

24          And I know the Court has read the probation

25  officer's response, but in particular, it would be on page 19

1  of the PSR, including the responses.  Specifically the

2  language of the fact that in September of 2018, the defendant

3  would pick the minor up in school, and they would engage in

4  sexual acts in the defendant's car.

5           During the investigation, agents recovered the

6  minor's phone.  Two videos depicting sexual acts between the

7  defendant and her were found and screen captures.  They also

8  found the line chats between the victim in this case and the

9  defendant, specifically the line chats where the defendant

10 says:  I want more pictures or pics of you.  I want to be able

11 to see us in our intimacy.  I want to even make videos.  And

12 that's where the cross reference applies.  They are in a --

13 performing sex acts regularly during the six-month period.

14 And at this point, he's enticing to create videos of them in

15 sex acts.

16          And based on that evidence alone, that should be

17 enough to apply that cross reference because it is enticement

18 for the purposes of making what would be child porn under the

19 definition of the statute.  So we believe the probation

20 officer's response is thorough and accurate, and we believe

21 that the cross reference does apply.

22          THE COURT:  Thank you.

23     (Pause in the proceeding.)

24          THE COURT:  In connection with the objections in the

25 PSR, I have reviewed the probation officer's response.  I do

think probation accurately responded, and I recognize Ms. Salmon's argument about Fourth Circuit cases.  I have some other cases to mention in connection with some of these objections.

The first objection is a factual objection that doesn't affect the advisory guideline range, and I think probation actually corrected it having to do with the timing of the age of the victim.

The second objection is another factual objection, and I think probation properly included the information under 3661, and the report accurately reflects what the defendant pleaded guilty to as part of the court martial and the reference in paragraph 28.

As for the third objection, this cross reference objection, I do think probation properly applied this in connection with the language.  There's also additional cases from outside, both within and outside the Fourth Circuit that I think help inform the correctness of the decision of probation and the recommendation of probation.

In *U.S. v. Korfhage*, 683 F.App'x 888, 892 (11th Cir. 2017), the 11th Circuit noted that the cross reference applies where one of defendant's purposes in enticing the victim was to produce a visual depiction of the conduct, engaging in sexual activity with a minor, and taking photographs is sufficient to apply the cross reference according to 11th

Circuit. In that case it was a defendant who took a minor to a hotel and took 17 pornographic images, and that was sufficient to support the cross reference.

Seeking sexual images from a victim via text message supports the cross reference. *See United States v. Liebert*, 554 F.App'x 173, 173 and 174. Sending sexually charged text messages concerning receipt of such messages is also sufficient. *United States v. Dye*, 2010 WL 4146187 (3d Cir. 2010).

Here, the Court does find that the record shows Moran enticed the victim to engage in sexual conduct with him where one of the purposes was producing images of such conduct. He initiated the romantic relationship with the victim via text message.

Ultimately, as Mr. Parris noted and as the record makes clear, agents recovered a multitude of images, including two videos and four images depicting the victim performing oral sex on the defendant and four images showing the victim and Moran engaging in intercourse. Recovered chats include a photo of the victim wearing underwear and a T-shirt that she sent to Moran. Moran asking the victim to send him a picture of his penis inside her vagina and telling the victim: I want more pics of you. I want to see us in our intimacy. I want to make videos. Probation properly scored it.

As for the fourth objection and the fifth objection,

they just kind of build on the cross reference.  And
probation, I think, properly scored that.

      As for the sixth objection to paragraph 63,
probation properly scores it and applies the enhancement if
the defendant causes the distribution of such material.
Section 2G2.1(b)(3) provides a two-level enhancement where the
defendant knowingly engaged in distribution.  Distribution is
defined in Comment Note 1 to mean any act, including
possession with intent to distribute, production,
transmission, advertisement and transportation related to the
transfer of material involving sex exploitation of a minor.  A
defendant engages in knowing distribution when he knowingly
commits the distribution, aids, abets, counsels, commands,
induces, procures or willfully causes the distribution or
conspires to distribute.

      When a defendant takes a picture of himself and his
minor victim having sex and then sends the picture to the
victim, he engages in distribution and the enhancement
applies.  See *U.S. v. Hernandez*, 894 F.3d 1104 at 1107-1109
(9th Cir. 2018).  Conversely, when a defendant causes a victim
to send him the same pictures of similar conduct, he causes
another to engage in distribution of child pornography.  See
*United States v. Broxmeyer*, 699 F.3d 265, 282-283 (2d Cir.
2012).

      Here, I think probation properly noted that Moran

asked the victim to send him pictures she had on her phone of them having a vaginal -- engaging in vaginal intercourse, which the victim sent to Moran on August 23rd, 2018, and I do think probation properly scored that.

The seventh objection is an objection to the two-level enhancement under 2G2.1(b)(6)(B) for computer use. Again, smart phone counts as a computer. See *United States v. Mathis*, 767 F.3d 1264, 1269-70. It was abrogated on other grounds by *Lockhart*, 577 U.S. 347 (2016), but it does qualify, and I think probation properly scored it -- he definitely used text messages to persuade, induce, entice or coerce the victim to take and send him sexually explicit pictures, not merely to send an existing picture.

As for the eighth objection, the objection to the five-level enhancement under 4B1.5(b)(1), I think probation properly scores that. And in *United States v. Fox*, 926 F.3d 1275, 1279-81 (11th Cir. 2019), the 11th Circuit held that repeated abuse of the same victim counts as "at least two separate occasions" for purposes of the enhancement. The enticement count says prohibited sexual conduct as it's prohibited by Chapter 117 and is an offense covered under Section 2426(b)(1)(A).

Moran definitely enticed the victim on more than one occasion. He took her to a hotel where they engaged in sexual intercourse and took her to an Airbnb where they engaged in

sexual intercourse. They took sexually explicit pictures and videos which does constitute production of child pornography. Probation did properly score it.

As for the ninth objection, it's a cumulative objection.

So all the guideline objections are preserved. But for purposes of *Booker* and its progeny, the total offense level is 43. The criminal history category is II. The advisory guideline range for a 43 and a II is life imprisonment.

Obviously, there's a statutory maximum on Count 2 of 15 years, but the statutory maximum on Count 3 is life.

So with the objections preserved, you agree, Ms. Salmon, that a 43 and II yields an advisory guideline range of life?

MS. SALMON: Yes, your Honor.

THE COURT: And the Government agrees that the advisory guideline range is life?

MR. PARRIS: Yes, Your Honor.

THE COURT: I'll hear first from Ms. Salmon on the 3553(a) factors. Then I'll hear from the defendant. Then I'll hear any victim allocution. Then I'll hear from Mr. Parris.

I have received and reviewed all the letters you submitted, Ms. Salmon. I appreciate the time it took for

people to write.  And I also have reviewed the forensic report
that you submitted in this case.

MS. SALMON:  Thank you, Your Honor.

As an administrative matter, we'd ask that
Dr. Hastings' report be admitted into the record for -- under
seal for purposes of this sentencing hearing.

THE COURT:  It'll be received.  It's at Docket
Entry 64.  It's on the docket under seal, but it'll be
received.

MS. SALMON:  Thank you, Your Honor.

Your Honor, the defense has submitted a motion for a
downward variant sentence.  And in that motion, we have
requested that the Court impose a 120-month sentence in this
case.  And, Your Honor, for the reasons that I'm about to
address, including the 3553(a) factors, leaning heavily on
Dr. Hastings' very thorough and insightful report, we would
submit that considering the totality of the circumstances and
Mr. Moran as the individual that he is, that a sentence not
to -- any -- the range above which the sentence would become
unreasonable, Your Honor, would be 15 years.  We think that
anything above 15 years we respectfully submit would be
greater than necessary to fulfill the purposes of sentencing.

Your Honor, the guideline range is life.  And as we
set forth in our motion and as the Supreme Court well
articulated in the *Graham* case, life sentences are reserved in

our system for the worst offenders that come before us;
individuals whom the system has said there is no more that can
be done; that there is no hope of rehabilitation; and that
just punishment and the protection of society require that
this individual never leaves incarceration again.

        And, Your Honor, when you take stock of the entire
personhood and life story of Emilio Moran, the defense submits
this case is exactly why *Gall* stands for the proposition that
the guidelines cannot even be presumed to be reasonable.

        In this case, a life guideline range is so far
extreme from the 3553(a) factors that Congress has set forth
for the following reasons.  I'll begin with the history and
characteristics of this defendant.

        And, Your Honor, I know that you read everything
that was submitted, so I'm not going to read anything, and I'm
not going to go on and on.  But for purposes of emphasis and
for Mr. Moran's purpose as he sits here on this very important
day, I do want to highlight these things.

        Mr. Moran has given most of his adult life in
service to our country as a United States Marine.  My brother
was a Navy pilot.  I have a lot of family members who were in
service.  And I know that even in the armed forces, the
Marines carry special significance for their duty, their honor
and their commitment to the country.  My brother would
sometimes jokingly say that the Navy just gives the Marines a

ride.  And I think that that was his nice way of saying that they were on the front lines of everything.  And the people that stand up for our country and be Marines know that they're putting their lives every day at risk for all of us.  And Mr. Moran was a very successful Marine.

I represent a lot of service members, and many of them find their way to service and to enlistment out of troubled childhoods.  A lot of those enlisted service members don't have the success that he had as a Marine.  He overcame a tumultuous abusive childhood, coming out of poverty, coming out of a central South American country, and graduated high school, looked around and chose service.  Kept himself out of trouble and rose above it.

And through his career as a Marine, I think it's very clear from Dr. Hastings' report that being a Marine gave Emilio a tremendous amount of life purpose.  It gave him a feeling of honor.  It gave him a feeling of service.  He had the rewards of knowing that he was doing something that was greater than himself.  He also had the reward of knowing he could provide for his family financially, which I think in a more traditional note -- I'm sorry, more traditional conception of what fatherhood means; that he thought that that was the most important thing that he could do was be there to financially support them and be this strong Marine provider.

Unfortunately, Your Honor, the nature -- I'm sorry,

the history and characteristics of this defendant also involve
a near fatal IED blast in 2007 when he was the machine gunner
in a Humvee near Jalalabad during his second deployment.  It
was an extended deployment, and the story is extremely
disturbing.  But they hit an explosive, and that's the last
thing that Emilio remembers before he woke up in a hospital
fighting for his life.  If you look at his face, you can
actually see where the scars are from all of his stitches.  I
think the PSR and Dr. Hastings' report says he got 32 stitches
to his head, and his body was broken, as you might imagine.

When he came back in 2007, the physical injuries
were healing.  The mental injuries and the mental trauma was
not addressed.  The United States military, Your Honor, in my
practice and in the general conversation about this, has come
a long way during the Afghanistan war and how they are
addressing mental health, trauma that our enlisted individuals
are serving abroad.

He had post-traumatic stress disorder, but he was
returned to service.  He did not have the opportunity to
receive any sort of intensive cognitive behavioral therapy.
And as Dr. Hastings' report correctly notes, the traumatic
brain injury, the post-traumatic stress disorder, the
accompanying major depressive disorder and secondary substance
abuse, all of these things join together and make a very
emotionally susceptible reactive situation for a service

member who returns in this way, and that was the case for
Emilio.  He never received that needed treatment.

Now, that's his history and characteristics up to
that point.  Mr. Moran is joined with a very supportive
family, and they're here, and also friends that are sitting in
the second and third row.  They have traveled from far
distances to be here, Your Honor, and show their support for
him.

So his history and characteristics also include
something that we do not often see in life guideline cases,
and that's two rows of people that are willing to say that
they stand beside him and are here to help him through what
will certainly be an extended prison sentence, but to
hopefully see him on the other side, embrace him and help him
to go forward and work on becoming the person that he wants to
be.

He will address Your Honor in a moment.  Emilio told
me that he very much enjoyed his time with Dr. Hastings.  That
that seven to eight hours that Dr. Hastings spent with him in
the Harnett County jail was the first time that he had ever
had the opportunity to sit down and talk through this very
complex, both mental and physical, health picture with a
doctor, with a neuropsychiatrist, with a person who's trained
to understand and can help him to understand how the physical
and the emotional and mental injuries have come to this place

1  and what he needs to do going forward.

2          Mr. Moran is receptive and welcoming of the

3  therapeutic options that the Bureau of Prisons will offer him.

4  He intends to take full opportunity to engage in those because

5  Mr. Moran's primary goal is to come out of prison when the

6  sentence Your Honor will impose is over and be the father that

7  his children deserve and the husband that his wife, Lavenia,

8  who is sitting here in the courtroom today, so much deserves.

9          And it is that hurt for them and for the victim in

10  this case, Your Honor, that I believe haunt Mr. Moran the

11  most.  I do submit, Your Honor, that he has done what the

12  system asks of him.  He has accepted responsibility.  He took

13  a plea agreement knowing that there may be a life guideline

14  range.  He didn't go to trial.  He didn't put the victim and

15  her family through that.  He took responsibility for it, and

16  here we are.  And he is on a journey to try to do whatever he

17  can to atone for these mistakes and to come out on the other

18  side of this the person of honor that he set himself up to be

19  through his decades as a Marine.

20          Your Honor, he has 28 commendations, two combat

21  ribbons and a Purple Heart for his service as a Marine at 39

22  years old.  He's only a 39-year-old man.

23          Now, I do want to talk as far as history and

24  characteristics of this defendant what Dr. Hastings' report

25  very thoroughly and I think accurately, believably,

competently tells us that he is not.  Perhaps most
importantly, Dr. Hastings found no paraphilic disorder, no
indication of sexual deviance as a clinical matter.  Even
knowing every detail about the offense conduct in this case,
Dr. Hastings found he had no paraphilic disorder.

He concluded that there was a low risk of recidivism
for sexual reoffending for Mr. Moran.  He concluded that
Mr. Moran was both receptive and likely to be successful if he
engaged in cognitive behavioral therapy and counseling.  And,
Your Honor, the summary begins on page 32 of Dr. Hastings'
extensive report.  And he anticipated that he would accepting
of treatment.

Other notable portions of that report that reflect
the history and characteristics of Mr. Moran, he found him to
be truthful and remorseful.  He noted that Mr. Moran
accurately reflected to him that while he had made
rationalizations during the time of the offense conduct as to
why this was okay or to engage in this behavior, he found that
Mr. Moran said to him:  But I understand why it's wrong.  I
understand that this is a very young teenage woman and that
she is a minor; that I am the person in control, and that
that's got the possibility for abuse and manipulation, and I
get that now.  That wasn't what I was focused at the time, but
I get that now.

Your Honor, the nature and circumstances of the

offense are tragic, wrong, and neither I nor Mr. Moran seek to minimize the seriousness in any respect. It is very, very serious. The context within which this tragic mistake was made, however, cannot be underemphasized.

As reflected in Dr. Hastings' report and in our motion, Your Honor, after being discharged from the military for having an extramarital affair, Emilio spent 90 days in the brig. He came out on the other side. And this happens so often, having never had any other job but being a Marine in his entire life, never having any other identity than being a Marine his entire life.

So he goes from being, as he said, a golden boy Marine to cleaning toilets. And that's actually what he was doing. He got a job as a janitor. And in this winter of his emotional life, he made the most disastrous, wrong and criminal choice that he has ever made, and, Your Honor, I submit that he could ever be expected to make, because I do not believe he's a risk of recidivism.

With that all said, Your Honor, I do want to address the need for just punishment, the need to deter others, avoid any danger to the public. Your Honor, we submit he is not a danger to the public. He's correctly found by Dr. Hastings to be a low risk of recidivism.

As far as deterring others, I think a 10- to 15-year sentence would deter anyone from engaging in an inappropriate

1   sexual relationship with a 14 to turning 15-year-old young
2   woman.

3           Your Honor, I submit to you that he is not a danger
4   and that there is no just purpose served with a life sentence
5   in this case.  We ask that you show him mercy; that when he
6   speaks to you in a moment and asks you for the same, that you
7   consider that in the context of the totality of the
8   circumstances and take great measure of *Gall's* central
9   holding, which is the guidelines cannot be presumed to be
10  reasonable.  We look at this individual man and this specific
11  circumstances, and the defense submits that a sentence in
12  excess of 15 years would be greater than necessary to fulfill
13  the purposes of sentencing.

14          I've gone on longer than I intended to, Your Honor;
15  but if there's any questions, either factually or as to any of
16  the factors that we've addressed that I can answer, I'm happy
17  to do so.  Thank you, sir.

18          THE COURT:  Thank you.

19          At this time I'll hear from Mr. Moran, if you'd like
20  to make a statement.

21          THE DEFENDANT:  Good afternoon, sir.  First and
22  foremost, I would like to say that I'm not trying to stand
23  here today and make any excuses for my error in judgment in
24  what I did.  I know that was wrong.  I deeply regret it, and I
25  accept full responsibility and the punishment that's to come.

I would like to apologize to the victim and family for not only betraying their trust, but for the pain, hurt and humiliation that I might have caused them.  I pray to God that he can heal their hearts and those damages and allow for forgiveness to take place so that their future -- her future might be rewarding.

To my wife, Lavenia, and my family who are here today, I'm also asking for forgiveness.  I let circumstances turn me into a man that I was not, and I have brought shame and hurt to you and our family.

I have seen this hurt on my kids' faces through the FaceTime visits.  I can only imagine the abandonment they felt when they came home and realized that I was not going to be home.  And it hurts me so much that I'm not going to be part of those special moments in life, like my son just getting his driver's license or setting up for a job interview.  My daughter always asking my wife:  I wish Dad was here so he can make things better.  And yet all this shame that I brought, my wife still stands here today supporting me, seeing the good that I still have inside of me.  And I thank her so much for that.

To my mother, who I have not seen in such a long time, I am sorry for hurting you and dragging you into such a shameful situation.  I wish that we could have repaired our relationship in a better way.  But I hope that one day we will

1 have the opportunity to be able to repair this relationship

2 that is currently broken.

3        Your Honor, I would like to apologize to you and the

4 court. I'm not trying to make any excuse for what I've done.

5 I deeply regret it, but that is not the person that I am right

6 now. Like my attorney said, the seven hours that I had with

7 Dr. Hastings, I learned that with proper counseling and my

8 current medication that I am on, that I have so much more to

9 give to not only society, but to my family also.

10        Your Honor, what I'm asking from you today is for

11 mercy, for a chance for me to one day be able to repair my

12 relationship with my family and to society, to show them that

13 I can -- that I am a better person and that I can stand here

14 and tell you this today because what is different is before, I

15 had no -- I didn't seek any help. I let the Marine pride get

16 in front of it, thinking I can handle my mental health

17 problems on my own, but now I seek any and all help, and I'm

18 willing to do any and all available programs that can help me

19 turn into a better person for society and for the family that

20 I deeply love.

21        THE COURT: Thank you, Mr. Moran.

22        At this time I'll hear any victim allocution and

23 then from the Government.

24        MR. PARRIS: Your Honor, with the Court's

25 permission, I'd like to introduce Trial Attorney Charles

Schmitz with the CEOS from Washington, D.C.  He's going to
offer the victim and victim's parents' statements to the
Court.

          THE COURT:  Thank you.  Good to have you here.

          MR. SCHMITZ:  Thank you, Your Honor.

          If it please the Court, I'm just going to read these
statements for the record.

          THE COURT:  That's fine.  Just don't get reading too
fast.  It's hard for the court reporter.  If people are
reading things, they may read fast.  That's what I'm told.
People who talk fast, it's not good for the court reporter.

          MR. SCHMITZ:  Thank you, Your Honor.

          Talking over the judge isn't easy for the court
reporter either.

          But I'll do my best.  It's not, of course, a
perfectly grammatical statement here.

          So the first statement, Your Honor, is from the
victim, and then the second statement will be from the
victim's parents.

          All right.  I have been dreading the writing of this
letter for two reasons:  To avoid, again, opening the several
emotions on this situation, and the difficulty of compacting
and wording the ways this has affected my life.  It wasn't
until I realized that this was my chance for my voice to be
heard and my offender, whom I was vulnerable to, can hear how

this has affected me.

When I was only 14 years old, I was attending a private school in Okinawa, Japan. I had never been to any type of public school since I was in kindergarten. I believe the primary reasoning behind my parents' decision to place me in private schools all of my life was to protect me from the gruesome things that had happened in this world.

I felt safe in my school, knowing that all members of the church and the school were people whom my family could trust. I was surrounded by people who cared for me and were friendly to me, which is why it never occurred to me that this was happening when the offender became overly friendly with me.

It started out with simple iMessage games which then escalated to a text conversation that no longer included games. During our text conversations, he often mentioned how unhappy he was in his marriage, and he took time to explain to me every fight that occurred between him and his wife, even saying he planned to divorce her.

He began coming to my school and would bring small things for me like snacks or drinks. Of course, no one suspected anything, even myself, considering this was a man whom my family was close with and trusted. He began telling me that I was beautiful and had a kind and loving heart.

From there, everything spiraled. I was this

innocent, naive freshman who had never even had her first
kiss. And just in a matter of weeks, all my firsts were taken
by this man who is 20 years older than me. I was taken by the
sweet words and thoughtful acts, the little notes he left in
my notebooks, love poems he wrote, gifts that he gave me. I
had never experienced this type of attention from a man to
whom I was not related.

That being said, I was so enthralled and caught up
in my feelings, I knew that I was -- I knew what I was feeling
was not what I should have felt towards this person; but I had
never felt anything like this before, and I didn't know what
to do with my emotions. It was as if I felt obligated to
return the attention.

At the time I had no previous knowledge of his
previous offenses. It was not until after the relationship
that I found out the truth. I was fooled like everybody else.
I thought he was a good person with good intentions, but I
realized that I was completely wrong when it was already too
late.

When I looked back at the relationship, I realized
he was quick to anger and would often act unreasonably when he
was upset. With this realization, I now wonder what would he
do now that he knows I've spoken my truth? If he could
attempt to take his own life, what could he do to mine?

After my parents discovered the relationship, I was

in a very dark place. Knowing that my family knew some parts
of the relationship was humiliating to me. As much as
possible, I avoided interactions with my mom, dad and brother
should they ask me questions about the relationship. I was
and am still too ashamed to discuss the events. This
destroyed the tight bond I had with them.

I felt gross and disgusted with myself for letting
something like this happen. I was so dumb and so naive, I
allowed myself to be used like an object. I blamed myself for
everything that happened. This burden that I put on myself
led to the only suicidal thoughts I've ever had. I thought
deeply about taking my own life; but realized that if I did
so, no one would ever be able to hear my story, justice would
never have been served, and he could have easily targeted
another young girl.

It has been over a year since I heard the news of
his being incarcerated. Before this I lived in fear,
completely unaware of what he could be capable of. There were
times when I was out in public, and I would see someone that
looked exactly like him, or I would see someone driving the
same car as him. My heart would drop and race, and I feared
for my safety. I was a lifeguard; and a few times, someone
signed in with the same first or last name, it would ruin my
whole day.

There are some clothes that I had to get rid of

because they brought me back to a bad memory. I used to adore love poems, but now I despise them. When I smell the black ice car freshener, I'm reminded of the biggest mistake of my life. I used to be a very trusting and friendly person who always tried to see the best in everyone. After this, my perspective has changed. I assume that everyone is out to get me. I now feel uncomfortable around any male figures outside of my home, whether it be male teachers, managers or coworkers.

I tend to think ahead into the future quite often. These are just some questions that cross my mind: What will I tell my husband if he asks me how my first years in high school were? What do I tell my daughter if she asks me about my first kiss? Most importantly, suppose my offender is sentenced to 15 years in jail? I will only be 32, and he will be roughly 52. Assume I already have children. How do I assure my children's safety and my own when he could be free from jail and seeking revenge? Am I going to live my life in constant fear, the same way I felt before he was imprisoned? Will I be frightened every time I see "unknown caller" on my phone screen?

Your Honor, I'll now read the statement from the victim's parents:

It is with deep appreciation and relief that this day has finally come. This man who we considered our family,

brother, uncle to our kids, a God-changed man, church worker
doing service for kids choir and a willing leader to assist in
the teen group; this man whom we let in and out of our home,
celebrated holidays, birthdays and out-of-town vacations
together, and ever present when we were going through rough
times with our teenager is now all in front of you because we
have been deceived.

This man has penetrated not just our family, but our
church and its Christian academy. This man is every parent's
family and friends worst nightmare. Dressed with a smile,
lowly heart and willing service, he can wreck a life, a
family, even of his own so cunningly that he can get them
defending him.

Through him being detained, we have dealt with all
the lies, gossip, character assassination, harassment and
almost a cyber-bullying of my family with his mother-in-law as
his accomplice. May I ask this Court to please grant the
sentence which this man deserves for most -- the most for the
safety of my child's future and anybody that gets in his way
if -- we would be taken -- if this would be taken lightly.

Thank you, Your Honor.

THE COURT: Thank you. I'll hear from the United
States on the 3553(a) factors.

MR. PARRIS: Your Honor, starting at the first
factor, the nature and circumstances of the offense. I know

the Court has read the PSR, but I'd like to go through and give the Government's view of how the facts of this case relate to also the characteristics of the defendant.

Looking at paragraph 11 of the pretrial sentencing report, it identifies that at the time of this offense -- and as you know, he was a former Marine -- he was in Okinawa with the Veteran Affairs Transition Systems program there at the air base in Okinawa, and that's where he met the victim and her family. He joined the church there. They became close family friends, and a trusting relationship began.

Paragraph 12 that we look at when it comes to the enticement. The defendant used the trust that he had gained through that relationship with that family and the victim and slowly lured her into the sexual relationship that lasted eight to six months. And if you look at the facts, if this was a teenage couple, this would be sweet. But if you look at all the information we have now and including the findings of Mr. Hastings, paragraph 12 sounds more like enticement and grooming to prepare her for what was ultimately the goal of a sexual act and sexual conduct. He even utilized text messages with sweet messages, kissy faces, even utilized Valentine's Day, saying: Maybe I'll get a kiss. And as the Court knows from reading this, it grew from there, unfortunately.

And so that is the question: Is this a relationship, a trusting relationship with a minor, or is it

1  grooming and enticement?  And the Government would offer that

2  it's grooming and enticement, especially when looking at the

3  statements on page 18 of Dr. Hastings' report.

4          "When asked about the potential negative effects a

5  child can experience from this type of relationship, Mr. Moran

6  was able to identify problems in future relationships and

7  intimacy along with more serious concerns, such as shame,

8  depression, anxiety and suicide."

9          So he was aware of the damage he could do to her

10  while all of this was happening in his own words.

11          We look at paragraphs 13 and 14.  It clearly

12  demonstrates the repetitive sexual interactions between the

13  defendant and the victim in this case.  And the victim

14  indicated at one point when they saw each other three -- three

15  times a week, they were engaged in sexual conduct and acts.

16  So this was a repetitive sexual acts with a minor.

17          And I would offer to the Court, it wasn't

18  voluntarily abandoned.  It was abandoned once there was the

19  fear that there would be an investigation and arrest and

20  prison time.

21          But as paragraphs 13 and 14 show, he would pick her

22  up from school.  He would take her on trips where the sexual

23  acts took her, and he would disguise it, once again, as a

24  relationship to keep these sexual acts going.

25          Turning to paragraphs 16 and 17, they even

utilize -- and by his request, and he would coach her on how
to use the line chat program in SnapChat to avoid detection so
they could freely talk about these sexual acts in this
relationship without getting caught.  At one point he even
provided her an iPhone, once again, to keep it secret from her
mom.

         Paragraph 18, while it doesn't necessarily discuss
the actual sexual acts, the Government believes it is very
important into the nature and the true nature of this
relationship and why the acts were more grooming than a caring
relationship.

         If you read through this -- and I know you have --
he did all this to save himself.  Paragraph 18 documents what
he did to save himself.  He coached her into lying to her
parents, faking suicidal intentions so her parents would stop
asking questions.  He, on numerous occasions, asked her to run
away from the only people in her life that truly loved her,
provided for her.  He also asked her at one point to put
vinegar inside of her to destroy any sperm evidence that
investigators could collect.  And even her response was:
Wasn't that -- wouldn't that hurt me?

         But that wasn't his concern.  His concern was
getting caught.  Paragraph 18 shows this was not a loving
relationship.  It was a sexual relationship with a minor.  And
18 shows the length he was willing to go and have her go to

protect him.  Once again, this was not an abandoned crime.  It stopped when it was discovered by her father.

Looking at the history and characteristics of the defendant, he only has one prior conviction.  And focusing on it just briefly, it shows a pattern, once again, of sexually illicit behavior, and we'll leave it at that.  He even went to prison or jail for 90 days for that illicit sexual conduct. And after being released, another illicit sexual conduct began again with a minor in this case.

I would also note, once again, the statement I've already read in Dr. Hastings' report, he knew it was wrong. He knew it could damage the victim.  And he went forth and did it any way.

Looking at the factors, the need to impose a sentence that reflects the seriousness of the offense, to promote the respect for the law, provide just punishment.  As you've heard from the victim impact statement and her parents, and even, once again, the discussions within Dr. Hastings' report, it will have a long impact on the victim and her family that she will have to work through and they will have to work through together.

It is a serious offense.  Six months of sexual acts and conduct, including making videos and pictures with a minor who was 14 and then turned 15 years old.

In her own words, the victim told you how she is

1  struggling with this, and it's not going to go away fast.  Her

2  fears about whether there will be retaliation, her parents'

3  fears and her own fears if this could happen to another minor

4  or child.

5        Based on the 3553(a) factors, the facts of this

6  case, all these factors, based on the victim's wishes and her

7  family's wishes, we believe that a sentence between 40 to 50

8  years is appropriate.

9        The guideline range is for life.  He did come in and

10 plead guilty and save a trial, and so that would take in

11 effect that factor.  But this crime, when you look at it and

12 you look at everything, looks more like grooming than a caring

13 relationship, and that is a danger to the public.  It may not

14 be a danger directly to the victim anymore, but it could, if

15 the defendant is released in a shorter period of time, be a

16 danger again to the public and another minor.

17       Thank you, Your Honor.

18       THE COURT:  How about the topic of restitution?

19       MR. PARRIS:  Yes, Your Honor.  The victim and her

20 family are asking for $20,000, and that's based on the job

21 loss of her mother, having to stay home and be with her and be

22 with the family in this time, so that is what the number is

23 based on at this time.

24       If the Court would like more to support the $20,000

25 requested, we would request the 90 days to be reserved to be

1 able to get more information for the Court.

2 THE COURT: Have you had any discussions with her

3 about counseling and -- for the victim?

4 MR. PARRIS: Yes, Your Honor. We have had

5 discussions. She's not currently now in therapy. It's one of

6 those processes where not all victims immediately start in

7 therapy. So no. At this time, to our knowledge, she is not

8 in therapy, but this is -- excuse me.

9 She may have had a few sessions, but she is not in

10 long-term therapy at this moment. Their request for

11 restitution is based on the need of the mother to not be able

12 to work, to be able to stay home with the victim at this time

13 and her family.

14 THE COURT: All right. Ms. Salmon, what's your

15 position on restitution?

16 MS. SALMON: Your Honor, in my most recent discovery

17 with the Government as to restitution was simply about the

18 number. This is the first that I'm hearing about what the

19 number is based on. It would certainly be the defense's

20 position that if the family is requesting damages or

21 restitution damages that are premised upon loss of earnings

22 for a parent, we'd like to see that documented. And to the

23 extent that more appropriate damages, such as mental health

24 counseling or other damages for the actual victim would be

25 presented, we'd like 90 days to try to figure that out as

well.

Your Honor, Mr. Moran certainly wants to comply with restitution provisions in order to try to assist the victim in the case, but we would want to make sure that the benefit was flowing to the victim.

THE COURT: Thank you.

Any other response to either the victim allocution or the Government's position on 3553(a)?

MS. SALMON: Your Honor, obviously we have a very large gulf between the 15 years that the defense has said is greater -- anything above 15 years would be greater than necessary and 40 years at the bottom that the Government is recommending. We maintain our position that a sentence between 10 and 15 years is sufficient but not greater than necessary.

I do -- I did not mention this in the initial 3553(a) presentation. But, Your Honor, Mr. Moran has cooperated with Harnett County law enforcement. I reached out to the ATF task force officer in an attempt to get a statement from him. I did not want to subpoena him because I work with him every day, and I knew that he would not like that very much. I was not able to get that in writing.

What happened, as I said in the motion, Your Honor, was an inmate actually overdosed that was in Mr. Moran's pod. It appears that those drugs may have come from inside the

jail.  Mr. Moran approached me the day following the overdose
death and said he would like to give information to the
internal investigations officer about what they were saying
about where those drugs were coming from.  He did so, and the
officer has told me that they believe that to be correct.

I think we may be hitting a little bit of a snag
because the SBI has now taken over that investigation, so
Harnett County Sheriff's Department is no longer
investigating, and I do not -- I told them that Mr. Moran is
still available.

But I did want Your Honor to know that because
this -- I told him he does not have a 5K provision in his plea
agreement.  There's no cooperation credit.  He still very much
wanted to do the right thing.  People are dying because of
illicit drugs in pretrial detention facilities in county jails
right now, as Your Honor knows.  And even this week he
provided some additional information to his pod officer about
marijuana coming in through a lot of the same people, and he
was rewarded with a very swift trip to the hole himself, so I
did want to mention that.

I do want to make sure that the record accurately
reflects what Dr. Hastings said about Mr. Moran's recognition
of the damage to the victim.  If you read the two paragraphs
in toto, he said that he now recognizes the harm to the victim
as he was working through this process and talking about it

1  with Dr. Hastings.

2           Even if he didn't understand it at the time, he's

3  now had plenty of time to understand that this relationship

4  and sexual conduct that he had rationalized harmed a person

5  very deeply.  And that show of empathy now and that

6  recognition of that harm, Your Honor, we ask that not be used

7  against him.  That is exactly what we want defendants to do,

8  is to try to step into the shoes of their victim and see how

9  they have harmed them.  We just beg Your Honor to show him

10 mercy and to not impose a sentence in excess of 15 years.

11          Thank you, sir.

12          THE COURT:  Thank you.

13     (Pause in the proceeding.)

14          THE COURT:  Mr. Moran, the Court recognizes its

15 obligation to impose a sentence sufficient but not greater

16 than necessary to comply with the purposes set forth in the

17 statute.

18          I have considered all arguments that your lawyer has

19 made, both here in court and in the motion that she submitted.

20 I have considered the report of Dr. Hastings.  I have

21 considered your statement.  I have considered the victim

22 allocution.  I have considered the position of the United

23 States.  I have considered the advisory guideline range.

24          Among other things, I'm to consider the nature and

25 circumstances of the offense and the history and

characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment; the need for the sentence imposed to deter others who might choose to engage in the criminal behavior that brings you here; the need for the sentence imposed to protect the public from further crime by you; the need for the sentence imposed to provide you with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; the need to avoid unwarranted sentencing disparities.

The statute lists numerous other factors. I have considered all those factors, although I won't mention each one individually.

As for the nature and circumstances of the offense, you did plead guilty to two offenses, sexual abuse of a minor and enticement of a minor. The crimes are serious crimes, as detailed in the PSR, and as we've discussed here today and as the victims talked about; in particular, both parents and the child.

You were in a position of trust with respect to that child. She was a ninth grader apparently at a Baptist school. You were working there. You had the trust of her family. You groomed her for this effort to obtain sexual gratification. I won't call it a relationship because it's not a relationship. At the time you were a much, much older man, a person who had

served in the Marine Corps who absolutely knew better than to sexually exploit a child who is a freshman in high school.

And I've considered the arguments associated with the issue, and I'm certainly going to take into account both your service in the Marine Corps as well as the PTSD and all the information contained in Dr. Hastings' report in imposing the sentence, but the offense conduct took place over months where you say you were at a low point psychologically. But I would submit that you knew it was wrong.

And part of what evidence there is that you knew it was wrong was the obstructive conduct when the conduct came to light, right, telling the child to destroy evidence. And all the conduct that preceded it was terrible. It will be very difficult for that child to ever have a normal, healthy relationship with a husband. It just will.

And you took things from her that she can never get back in terms of, as she said in her allocution, people can view the world with a trusting eye or with a distrustful eye, and you have ensured that she will look at the world with a distrusting eye because someone in a position of trust and responsibility and a person who had a relationship with her family used that relationship to sexually exploit her, to groom her, to try and then get her to lie about it, to participate in the production of child pornography. That's what it is, so it's incredibly serious offense behavior.

1          I've taken into account the reality that you did

2   have the injury in Afghanistan and didn't get mental health

3   treatment.  But you did have this situation where you

4   obviously had engaged in this adulterous relationship, and

5   your Marine Corps career ended, and you didn't get

6   psychological treatment.

7          But I think the request of your counsel for the memo

8   or the motion at Docket Entry 72 asks for a sentence of 120

9   months.  She said no more than 180 months here in court.  And

10  as part of the rationale, there's a suggestion that you're a

11  low risk of recidivism, likely to be successful in treatment,

12  no indication of paraphilia, honest and remorseful.

13         I'll accept the idea that you're remorseful.

14  Certainly, the doctor says no indication of paraphilia, and

15  I'll certainly make recommendations about treatment.  Low risk

16  of recidivism, the doctor says that.  Focused in particular on

17  sexual recidivism, not exclusively, but I also have to weigh

18  just punishment for this seriously wrong conduct over the

19  course of months sexually exploiting a little girl who was a

20  freshman in high school, and to do it repeatedly; and not just

21  sexual exploitation, but the grooming and the enticement and

22  the videos and the photographs.

23         I've taken into account the argument that your

24  lawyer makes about not having unwarranted sentencing

25  disparities and the citation to the James Peele sentence.

Each case is different, and the attempted distinction by your
defense lawyer saying that the only thing that's different is
that there were texts and pictures in this case.  I, of
course, did not sentence that individual.  Each individual
case is different.  I will submit this case is terrible, and I
don't think you're similarly situated with Mr. Peele.

I've taken into account the arguments associated
with your tumultuous childhood, which are referenced.  And I
recognize that -- and the doctor talked about it, leaving the
Dominican Republic and then being in a bad situation with your
father in terms of how he interacted with you and his
emotional and physical abuse and his disciplining of you with
respect to academic performance or lack of performance and him
being unhappy about your decision to join the Marines.  And
I've taken all that into account, but I don't think that that
warrants the extreme downward variance your counsel has asked
for.

Again, the guidelines are just one of many factors
I'm to consider.  I've got to balance this very serious nature
of the criminal offense conduct that took place over a long
period of time that I think you knew better.  And that --
balance that, take into account your documented PTSD and the
other things that the doctor says about you in the report, I
recognize.  I read it all, that it references at page 22 of
the report, post-traumatic stress disorder; major depressive

disorder, recurrent, mild to moderate; alcohol use disorder,

in sustained remission; avoidant, obsessive-compulsive, and

borderline personality traits.  Again, I've taken into account

his assessment of risk of sexual reoffending.

I take what Ms. Salmon said about -- that

Dr. Hastings' report associated with how a victim would

perceive this.  Even accepting that, I think it's clear that

you knew it was wrong when you were doing this, because you're

sneaking around with a 14-year-old girl.  And so you knew it

was wrong and you knew it was exploitive, and you did it

anyway.  And you need to be punished for that, and you will

be; not as much as the Government has asked for, and certainly

not what your defense lawyer has asked for.

Having fully considered the entire record in the

case, all of the arguments of counsel, both in writing and

here in court, it's the judgment of the Court that Emilio R.

Moran is hereby committed to the custody of the Bureau of

Prisons to be imprisoned for 180 months on Count 2 and a term

of 420 months on Count 3 to be served concurrently.

The Court has considered all the 3553(a) factors in

imposing this sentence, all the arguments, including the

diagnosed post-traumatic stress disorder, the report of

Dr. Hastings, the victim allocution, the positive and

negatives in Mr. Moran's life, including his service in the

Marine Corps and all of the commendations he received as a

1 Marine.

2          Pursuant to the plea agreement, Counts 1, 4, 5, 6,

3 7, and 8 are dismissed.

4          Upon release, you'll be placed on supervised release

5 for 10 years. This consists of 10 years on Count 2 and 10

6 years on Count 3 to run concurrently.

7          After carefully considering 18 U.S.C., Section

8 3583(d) and 18 U.S.C., Section 3553(a), the Court now imposes

9 the mandatory and standard conditions of supervision adopted

10 in the Eastern District of North Carolina as referenced in

11 Standing Order 21-SO-5. The Court finds that those conditions

12 are reasonably related to the factors in 3553(a), involve no

13 greater depravation of liberty than necessary under 3553(a),

14 and are consistent with relevant Sentencing Commission policy

15 statements as described in *United States v. Singletary*, 984

16 F.3d 341 (4th Cir. 2021).

17          You shall comply with the following special

18 conditions which the Court imposes based on statutory

19 requirements, the nature of the offenses of conviction, your

20 history, your mental health needs, the need to rehabilitate,

21 the need to monitor you and the payment of restitution and to

22 adequately supervise you.

23          One, you shall participate in a program of mental

24 health treatment as directed by probation.

25          Two, you shall participate in a vocational training

program as directed by probation.

Three, you shall not incur new credit charges or open additional lines of credit without the approval of the probation office due to the anticipated restitution order.

Four, you shall provide the probation officer with access to any requested financial information due to the anticipated restitution order.

Five, you shall cooperate in the collection of DNA as directed by probation.

Six, you shall have no direct or indirect contact at any time for any reason with the victim, the victim's family or affected parties in this matter unless provided with specific written authorization in advance by the probation officer.

Seven, you shall submit to psychosexual evaluation by a qualified mental health professional who's experienced in evaluating sex offenders and is approved by U.S. Probation.

Eight, you shall participate in a sex offender treatment program as directed by probation, and you shall comply with and abide by all rules and requirements and conditions of the treatment program until discharged. You shall take medications as prescribed by the treatment provider.

Nine, at the direction of probation, you shall submit to a physiological test which may include, but not

limited to, polygraph exams or other tests and monitor your compliance with probation or supervised release and treatment conditions.

Ten, your residence and employment shall be approved by probation. Any proposed change in residence or employment must be provided to the probation officer at least 10 days before the change and preapproved before the change may take place.

11, you must comply with the requirements of the Sex Offender Registration and Notification Act as directed by probation and Bureau of Prisons or any state sex offender registration agency in the location where you reside, work, are a student or are convicted of a qualifying offense.

12, to ensure compliance with supervision, you shall submit to unannounced searches of any computer or computer equipment, including mobile phones, which in the discretion of probation may include the use of computer monitoring technology, computer search or analysis software and copying of all data from the device and external peripherals. Such examination may require the removal of devices from your possession for the purpose of conducting a thorough inspection. The Court imposes that condition given the nature of the offense conduct in this case.

At the direction of probation, you shall consent to the installation of systems or software that will allow

probation or a designee to monitor computer use on any computer that the defendant owns or is authorized to use. You shall pay the costs of the monitoring. Again, this condition is imposed in light of the nature of the offense conduct.

You shall not use, possess or control any computer-based counter forensic tools. You shall not use or have installed any programs specifically and solely designed to encrypt data, files, folders, or volumes of any media. You shall, upon request, immediately provide Probation Office with any and all passwords required to access data compressed or encrypted for storage by any software.

You shall submit to a search of your person, house, residence, vehicles, papers, computer and other electronic communication or data storage devices or media and effects at any time with or without a warrant. A search may be conducted by any law enforcement officer or probation officer with reasonable suspicion concerning a violation of conditions of supervision or unlawful conduct by you and by any probation officer in the discharge of the officer's supervision function.

You shall support your children. You must make restitution in accordance with 18 U.S.C., Section 3663(a) and 3663 and any other statute authorizing restitution. Payment of restitution will be due and payable in full immediately once the Court enters the order of restitution. However,

because I do not anticipate you'll be able to pay in full

immediately, the special assessment and restitution can be

paid through the Inmate Financial Responsibility Program.

You'll pay a minimum of $25 per quarter through the Inmate

Financial Responsibility Program.  Having considered your

financial resources and ability to pay, the Court orders that

any balance still owed at the time of release shall be paid in

installments of $200 a month beginning 60 days after your

release.  At the time of your release, the probation officer

shall take into account your ability to pay the restitution

ordered and shall notify the Court of any needed modification

or payment schedule.

The drug testing conditions under 18 U.S.C., Section

3608 is suspended based upon the Court's determination that

you pose a low risk of future substance abuse.  You shall pay

a special assessment of $200.

I'm not going to order an assessment under the

Justice for Victims of Trafficking Act of 2015 due to an

inability to pay on top of the anticipated restitution order.

I will impose restitution but will delay imposition of that

order until final determination of the victim's losses can be

made.  The delay in imposition shall not exceed 90 days from

today's date as set forth in 18 U.S.C., Section 3664(d)(5).

I expect counsel to work with one another to see if

there can be a joint order.  If there cannot, then I want the

order prior to that 90-day period so we can have a hearing and I can determine restitution. I'm not going to impose a fine in light of the restitution that I anticipate entering in this case.

I do think I've properly calculated the advisory guideline range in this case, but I announce pursuant to *U.S. v. Gomez-Jimenez,* 750 F.3d 370 (4th Cir. 2014) and *U.S. v. Hargrove,* 701 F.3d 156 (4th Cir. 2012), that I'd impose the same sentence as an alternative variant sentence if I have, in any way, miscalculated the advisory guideline range.

In imposing this sentence, I've carefully and thoughtfully considered each word each lawyer has said to me. I have not parroted back each word each lawyer has said to me. Just as an Appellate Court does not parrot back each word that a lawyer says to the Appellate Court in their brief doesn't mean the Appellate Court hasn't considered what they've said. If they don't do what the appellant or appellee want, it means they've rejected the argument after having thoughtfully considered it.

I have thoughtfully considered every word each lawyer has said to me. I've imposed a sentence different than what each lawyer has said to me. The reason I've done it is because I balance the 3553(a) factors differently than they propose that I balance them, and I explained why. And in doing that, I have emphasized what I found to be significant

under 3553(a) and discounted what they propose that I find to be significant.

I recommend mental health evaluation and treatment. I recommend -- did you want any other sort of treatment?

MS. SALMON: Yes, Your Honor. Based on Dr. Hastings' finding that he was in alcohol use disorder remission, we'd ask for substance abuse treatment.

THE COURT: All right. I recommend the most intensive substance abuse treatment. I recommend vocational, educational opportunities so Mr. Moran can use his intelligence to develop skills so that when he gets out, he can live in a law-abiding and productive way.

Mr. Moran, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceeding that was not waived by your guilty plea.

You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think your sentence is contrary to law.

However, you did enter into a plea agreement that contains an appellate waiver. In light of your sentence, I believe you've waived your right to appeal.

If you believe the waiver is unenforceable or inapplicable for any reason, you can present that theory to the Appellate Court.

 1          With few exceptions, any Notice of Appeal must be
 2   filed within 14 days of the judgment being entered on the
 3   docket in your case.
 4          If you're unable to pay the cost of an appeal, you
 5   may apply for leave to appeal *in forma pauperis*.
 6          If you so request, the Clerk of Court will prepare
 7   and file a Notice of Appeal on your behalf.
 8          I do thank counsel for their work.
 9          Is there anything else from the United States?
10          MR. PARRIS:  No.  Thank you, Your Honor.
11          THE COURT:  Anything else from the defense?
12          MS. SALMON:  Your Honor, Mr. Moran would request
13   that you make a recommendation for Butner.
14          THE COURT:  I will recommend that he serve his
15   sentence at Butner.
16          MS. SALMON:  Thank you, sir.  Nothing further.
17          THE COURT:  All right.  That'll conclude the matter
18   involving Mr. Moran.  Good luck to you, sir.
19          We'll be in recess until 9:00 a.m. tomorrow.
20                    *      *      *
21          (The proceedings concluded at 3:30 p.m.)
22
23
24
25

```
 1                  UNITED STATE DISTRICT COURT

 2              EASTERN DISTRICT OF NORTH CAROLINA

 3

 4

 5              CERTIFICATE OF OFFICIAL REPORTER

 6

 7          I, Amy M. Condon, CRR, RPR, CSR, Federal Official

 8   Court Reporter, in and for the United States District Court

 9   for the Eastern District of North Carolina, do hereby certify

10   that pursuant to Section 753, Title 28, United States Code,

11   that the foregoing is a true and correct transcript of the

12   stenographically reported proceedings held in the

13   above-entitled matter and that the transcript page format is

14   in conformance with the regulations of the Judicial Conference

15   of the United States.

16

17

18   Dated this 22nd day of September, 2021.

19

20                               _____
                                 /s/ Amy M. Condon
21                               Amy M. Condon, CRR, CSR, RPR
                                 U.S. Official Court Reporter
22

23

24

25
```